UNITED STATES BANKRUPTCY COURT
WESTERN DIVISION OF MICHIGAN
SOUTHERN DIVISION

In Re:                                          Case No.  17-00047

ROBIN L. KRUTEL,                                Chapter 7

       Debtor.                                  HON. JAMES W. BOYD

_____/

KELLEY R. BROWN                                 Adversary Proceeding No: 17-80052

       Plaintiff,
V

ROBIN FROMILLE, f/k/a
ROBIN L. KRUTEL,
also f/k/a ROBIN THOMAS-KRUTEL

       Defendant.
_____/

## SECOND AMENDED COMPLAINT

The Plaintiff, Kelley R. Brown, by and through his attorney Martin L. Rogalski of Martin L.

Rogalski, P.C., complains against the Defendant, Robin Fromille, f/k/a Robin L. Krutel, also f/k/a

Robin Thomas-Krutel, as follows:

## GENERAL ALLEGATIONS

1.  This Court has jurisdiction over this case, an Adversary Proceeding, pursuant to

    28 U.S.C. §1334, 28 U.S.C. §157 and Local Rule 83.2 of the United States District

    Court for the Western District of Michigan.

2.  Venue exists pursuant to 28 U.S.C. §1409.

3.  This Adversary Proceeding constitutes a "core proceeding" as defined in 28 U.S.C.

    §157(b).

4.  On January 5, 2017, the Defendant as Debtor, filed a Voluntary Petition for relief

    under Chapter 7 of Title 11 of the United States Bankruptcy Code.

5.  The Plaintiff, Kelley R. Brown, is an individual residing at 3144 Juniper Ct. NE, Grand Rapids, MI 49505.

6.  The Defendant, Robin Fromille, f/k/a Robin L. Krutel, also f/k/a Robin Thomas-Krutel, is an individual residing at 7153 Cuesta Way Drive NE, Rockford, MI 49341.

## COUNT I – FRAUD
## (11 U.S.C. § 523(a)(2)(A)

7.  Plaintiff met Defendant at a Halloween Party in the fall of 2011.

8.  At that time, Plaintiff was single and unattached to any woman.

9.  Plaintiff owned his own home in Wyoming, Michigan.

10. Plaintiff had one minor child residing with him.

11. At that time, Defendant was married but going through divorce proceedings to end her marriage.

12. Defendant was residing in her marital home with her two minor children,

13. Defendant had knowledge that she would not be able to afford to retain the marital home as part of the property settlement of her pending divorce.

14. Within two weeks of meeting each other Plaintiff and Defendant became physically intimate with each other and started a romantic relationship.

15. Subsequently, Plaintiff and Defendant were residing together, with the children they each had, at Defendant's marital home.

16. The Judgment of Divorce between Defendant and her former husband required the marital home to be sold within a short time frame.

17. Discussions occurred between Plaintiff and Defendant concerning where Defendant was to live, because of Defendant's inability to remain long term at Defendant's marital residence.

18. Plaintiff offered to have Defendant live with him at his Wyoming, Michigan residence, but Defendant declined the offer for various reasons.

2

19. One of the various reasons was that Plaintiff had a roommate residing with him in his Wyoming, Michigan residence.

20. As the deadline for Defendant to leave her marital residence grew closer, Defendant appeared to become fearful as to where she was going to live, because she had no designated place to move.

21. It was at this time that the Defendant decided to take advantage of the Plaintiff and the intimate relationship which Defendant had created with Plaintiff.

22. Defendant suggested to Plaintiff that the two of them purchase a house together and reside in it together.

23. Defendant represented to Plaintiff that is was her intention that the house would be jointly owned by the two of them.

24. Defendant also represented to Plaintiff that it was her intention that they would soon marry and would create a blended family in their jointly owned home.

25. Such representations as to Defendant's intentions to own a house jointly with the Plaintiff and that the Defendant would soon marry the Plaintiff were false.

26. Defendant knew the representations of her intentions to Plaintiff were false when she made them.

27. Plaintiff relied upon Defendant's representations and acted in accordance with them to his detriment.

28. Plaintiff suffered damages due to the loss of money and property expended to obtain a house in which both Plaintiff and Defendant and the children would live, as described in the Complaint.

29. Plaintiff lost money, as the seventy-two thousand dollar ($72,000.00) profit made when house located in Rockford, Michigan (the Stone Crest Home) was sold.

30. Said damages incurred by the Plaintiff were directly and proximately caused by the Plaintiff's reliance upon the misrepresentations of Defendants intent.

31. In late 2011 the parties began house shopping together for the purpose of selecting a property for joint ownership and investment.

32. The parties' utilized the broker services of Larry and Marilyn Menetti in connection with their house shopping.

33. Communications between the Menettis were jointly addressed to Mr. Brown and Ms. Thomas, relative to the parties' house shopping efforts (**Exhibit A**).

34. In late 2011 or early 2012 Defendant told Plaintiff that none of the pre-existing houses which they looked at were acceptable to her as a residence.

35. In the spring of 2012 Plaintiff and Defendant viewed and selected a vacant lot in Stone Crest Development with the address of 9445 Crest Circle Drive NE, Rockford, MI 49341, and parties made a mutual decision to build a home at the site (the "Stone Crest Home") [Lot No. 17].

36. At the time that Lot No. 17 was selected Defendant made the statement to Plaintiff, "Let us build this together."

37. Defendant then entered into a relationship with a realtor to purchase Lot No.17, upon which to custom build the house for Defendant.

38. The contract to retain a realtor, formally known as on "Exclusive Buyer Agency Contract", dated March 12, 2012, was signed only by Defendant and the realtor.

39. Defendant did not offer Plaintiff an opportunity to sign the contract with the realtor.

40. The realtors used by Defendant were Larry and Marilyn Mennetti.

41. The Defendant had known the Mennettis for many years and had previously used their realtor services.

42. Defendant did not disclose to the Plaintiff the existence of the realtor contract.

43. Defendant never disclosed to Plaintiff that the contract to retain a realtor had been individually signed.

44. In connection with the mutual decision, Plaintiff initiated contact with Ada Mortgage and began the process of providing financial information requested of the broker for both himself and Defendant.

45. Communications took place relative to the joint mortgage application (**Exhibit B**).

46. Defendant had knowledge that Plaintiff was pursuing financing for Lot No. 17 and financing for the construction of the house.

47. Defendant did not take action of any kind to prevent Plaintiff's pursuit of financing, further misleading Plaintiff as to her intentions.

48. Defendant did not have any intention of using any financing which Plaintiff might obtain.

49. Plaintiff was present with the Defendant when the houses were reviewed for possible purchase.

50. Plaintiff was present with Defendant when Defendant viewed Lot No. 17, which Defendant eventually purchased individually on April 18, 2012.

51. Defendant's true intention was to knowingly mislead Plaintiff and utilize his financial resources to obtain a house which Plaintiff was to separately finance and purchase.

52. Defendant intended to lead Plaintiff on into thinking that all of the money he would expend on the house would be for a house which they both would own together.

53. Defendant was so skillful in hiding her true intentions from Plaintiff that Plaintiff believed it was necessary for him to attend the closing at the title company, at which Defendant took sole ownership of the real property upon which the newly constructed house had been built.

54. While preparations for a closing were made, Plaintiff made arrangements with the builder (the home was under construction) and scheduled direct improvements to the home that would increase its appraised value including, but not limited to, the installation of finished Brazilian teak hardwood flooring (approximately 950 sq/ft) and

CAT5 and COAX wiring throughout the entire home and modifications for a wall mounted television and surround speakers (the "Pre-Closing Installations").

55. The Pre-Closing Installations were made at Plaintiff's sole expense and installed prior to the closing in anticipation of his ownership.

56. While the Pre-Closing Installations were underway, the real estate agent involved in the transaction recommended to Defendant and Plaintiff that they seek an MCC Certificate for first time home buyers, and in connection therewith, the loan processing was transferred to a new lender. Plaintiff continued to interface with the new lender in supplying the couple's financial information.

57. Unknown to Plaintiff, the Defendant and the realtors, Larry and Marilyn Menetti, were working behind the scenes with the new lender to arrange for the MCC Certificate solely in the Defendant's name, as well as financing and ownership of the home solely in Defendant's name.

58. The Buy-Sell Agreement was signed solely by the Defendant, which was not disclosed to Plaintiff.

59. Because Plaintiff was not a first time home buyer, Plaintiff did not qualify for the certificate.

60. The Defendant, without informing Plaintiff, set up the mortgage loan to exclude the Plaintiff's name from the final loan documentation as well as ownership of the new residence.

61. A MCC Certificate provides housing assistance by issuing a federal tax credit to a first time home buyer.

62. Qualified home buyers can obtain a credit of 20% of their annual mortgage interest paid against their year end tax liability. A tax credit is a dollar for dollar reduction in tax liability.

63. The MCC tax credit is allowable every year for the life of the original mortgage (up to thirty years).

64. The MCC Certificate could have saved the parties approximately $80,000.00 over the life of the thirty year mortgage in income taxes.

65. When Plaintiff arrived at the closing, he was surprised to learn that he had been excluded from the loan and ownership documentation, because of the fact that he had a current mortgage that would have disqualified the pair from the issuance of this MCC Certificate.

66. The Chicago Title agents, present at the closing, assured Plaintiff that he could be added to the title six (6) months later and Defendant acknowledged that it was her plan to add Plaintiff to the title at that time.

67. In reliance upon Defendant's representations and in connection with the parties' move into the Stone Crest Home, Plaintiff interfaced with the Association and paid all Association dues, had homeowners insurance (USAA) placed in his name, and solely paid for the installation of gutters, yard and landscaping (the Post-Closing Installation).

68. In continuing reliance upon Defendant's representation, Plaintiff paid one-half of the mortgage and related carrying costs for the Stone Crest Home, an additional $12,000.00 over eighteen (18) months.

69. The Plaintiff and Defendant held themselves out to their friends and family as co-owners of the property.

70. When Defendant announced a housewarming party on Facebook, the announcement was entitled: "Robin and Kelley's Housewarming Party".

71. Friends responding to the Facebook invitation made comments consistent with the representation that Plaintiff was a co-owner.  One such comment was: "Robin and

Kelley, so happy you are finally in your new home …. Wishing you all the best together in your new home."

72. After approximately eighteen (18) months of joint possession of the Stone Crest Home, Defendant abruptly barred Plaintiff from the Stone Crest Home and refused him re-entry for the recovery of certain personal property within the Home, including, but not limited to, Plaintiff's Jenn-Air oven and personal computer located within the Home ("the Converted Personal Property").

73. Defendant failed and refused to honor her promise and representation to add Plaintiff's name to the title of the Stone Crest Home and has since sold the Stone Crest Home to a new owner at a gain of $72,000.00.

74. Despite repeated attempts to recover the Converted Personal Property, Defendant has failed and refused to return the same.

75. Plaintiff made the Pre-Closing Installations to the Stone Crest Home in anticipation of becoming an owner of the same at the closing.

76. Plaintiff made the Post-Closing Installations to the Stone Crest Home in reasonable reliance upon Defendant's representation that his name would be added to the title post-closing.

77. Defendant made both the Pre-Closing and Post-Closing Installations with the expectation of receiving the benefit of those Installations through transfer of an ownership interest in the Home.

78. Neither the Pre-Closing nor Post-Closing Installations were gratuitous, and Defendant accepted the benefit of those Installations with full knowledge of Plaintiff's ownership expectations.

79. Defendant has now benefitted from the Installations in connection with the realization of additional value upon the sale and transfer of the Stone Crest Home.

8

80. All actions taken by Plaintiff in reliance upon Defendant's representations were reasonable. The reliance was to Plaintiff's detriment and he suffered damages accordingly which were direct and proximately caused by Defendant's representations which were fraudulent.

81. The value added to the Stone Crest Home by Plaintiff's Installations total approximately $23,000.00.

82. Defendant's conversion of Plaintiff's personal property to her own use renders Defendant liable under MCLA 600.2919a for three times the value of the Converted Personal Property, plus Plaintiff's reasonable attorney's fees incurred in connection with this claim.

83. The value of the Converted Personal Property is approximately $2,500.

84. Damages are:

   a. $23,000.00 as to the value of the improvements.

   b. $ 7,500.00 treble damages on the converted personal property.

   c. $ 8,500.00 attorney fees, at present.

   d. $36,000.00 one-half of gain made on sale of property.

   e. Any additional damages as discovery may disclose.

      TOTAL:  $75,000.00

WHEREFORE, Plaintiff respectfully requests that this Court:

   1. Enter a money Judgment against the Defendant and in Plaintiff's favor for the value of the Pre-Closing Installations, the Post-Closing Installations;

   2. Treble the value of the Converted Personal Property and;

   3. Further award Plaintiff costs and reasonable attorney fees incurred in connection with this action in accordance with MCLA 600.2919a;

   4. Award Plaintiff for the loss of the gain made in the sale of the real property;

5.  Determine that the amount of the Judgment of $75,000.00 is not
    dischargeable pursuant to 11 USC §522(a)(2).

## COUNT II
## 11 USC §522(a)(4)

Plaintiff incorporates by reference Plaintiff's 1-44 as if fully restated in this paragraph.

85. Plaintiff and Defendant decided to pool their resources and become partners in their
    efforts to find a residence which they could own jointly.

86. It was the intention of both parties to work together for their mutual benefit in
    acquiring and maintaining the joint residence.

87. As partners, the Defendant was a fiduciary as to the Plaintiff.

88. Both parties acquired the location for their new residence and agreed on the type of
    house to be built.

89. Plaintiff expended substantial sums on the purchase and improvement of the new
    residence.

90. Defendant breached her duty to Plaintiff in many ways, including but not limited to
    the following actions:

    a.  By securing the title to the residence solely in her name;

    b.  By misrepresenting her intent at the closing to place Plaintiff's name on the
        title with hers;

    c.  By failing to disclose her plans to individually own and finance the real
        property;

    d.  Barring Plaintiff from possession of the residence;

    e.  By not accounting to Plaintiff at the time of the sale of the real property to a
        third party.

    f.  By not paying over to the Plaintiff his share of the net equity resulting from the
        liquidation of the principal partnership asset, the residence;

10

g. By not crediting Plaintiff's capital account for the partners the amount of money in the principal asset of the partnership, the newly built residence.

36. Plaintiff was damaged as a direct proximate result of Defendant's breach of her fiduciary duty.

WHEREFORE, Plaintiff respectfully requests that this Court:

1. Enter a money Judgment against the Defendant and in Plaintiff's favor for the value of the Pre-Closing Installations, the Post-Closing Installations;

2. Treble the value of the Converted Personal Property and;

3. Further award Plaintiff costs and reasonable attorney fees incurred in connection with this action in accordance with MCLA 600.2919a;

4. Award Plaintiff for the loss of the gain made in the sale of the real property;

5. Determine that the amount of the Judgment of $75,000.00 is not dischargeable pursuant to 11 USC §522(a)(4).


Respectfully submitted,

Dated: August 31, 2018                    By: /s/ Martin L. Rogalski
                                               Martin L. Rogalski (P30548)
                                               MARTIN L. ROGALSKI, P.C.
                                               1881 Georgetown Center Drive
                                               Jenison, Michigan  49428
                                               (616) 457-4410

11

# EXHIBIT A

KB

| | |
|---|---|
| **From:** | Larry & Marilyn [larryandmarilyn@grar.com] |
| **Sent:** | Friday, March 09, 2012 10:25 AM |
| **To:** | kelleybrown1@comcast.net; Robin Thomas |
| **Subject:** | Re: HOME SWEET HOME |

Kelley and Robin

I did not schedule other appointments this afternoon because I had it booked for you guys. I am at a disadvantage here. Until I know what you can buy – and the $200,000 range is not on the table now until there is some determination on your house on 36th St. Even if you buy 5% down conventional because of the PMI you are not there. Until I have a number I do not know what to schedule. I agree 4 houses would be great but which 4. Three of the homes Robin sent are about $200,000 or over. One is $154,000.  I don't know what you can buy. I know you need to buy NOW. When I actually get the information I need – the amount you can qualify for in writing – I can and will clear my schedule for you. We will find you a home that you can purchase. A seller won't even look at an offer until I send that piece of paper with it.

I left a message for Greg this morning and hopefully I will hear something soon. The issue is I need to schedule appointments. That means calling a listing agent, having them talk to the seller and make arrangements. If there is a pet in the home the owner needs to make arrangements. I have been asking all week for the information I needed to do this. When I call to schedule and appointment the first thing I am asked is if my buyer is approved. I am asked how they would buy and what the time frame is. I need those answers. I can sometimes schedule a vacant home quickly but that depends how quickly I can reach the listing agent. Usually scheduling showings takes 24 hours or more. Looking at homes you can't buy does not get you to the finish line faster. I know Robin can't look Saturday or Sunday. You are not available either. We can look most evenings because we have daylight until almost 7:00 now. I know this is hard but I don't have the information I need to work with. Usually when a buyer is looking to buy they sit down face to face with a mortgage lender for an appointment that can last over an hour. You bring all the docs they ask for to the meeting and fill out a formal application. The loan officer discusses with you all of the various options and what will or will not work.  After you leave the information is processed and within a couple days the end product – an approval letter is issued. This is being put together in pieces and you still (at least I don't think so) have not sat down face to face with Greg. This has resulted in a lot of missed information and confusion and taken MUCH longer that it should have. I will do everything I can to get this done for you.

I am not doing my job for you if I have you write an offer, invest your hard earned money into inspections, get the kids excited, waste your time when you find out 30 days from now you can't close on the house you bought (or tried to buy). I talked to another lender I have worked with in the past yesterday about FHA possibilities. She told me you guys would have to qualify for BOTH mortgages (36th St and the new home) and they will not allow rent as income. This is not easy. I also wondered if Robin could do RD by herself and and MCC certificate and qualify in the $150 to $160 range.  Until the issue of the 36th St house is resolved we have a problem. If we need to go this route Robin will need to go to another lender because Greg does not participate in the MCC program.

Keep me posted with what is happening and I will wait for Greg's call here.

8

Robin Thomas <thom...@g...com>

Robin can qualify for $1600K and I can come up with cash, up to $3,500K.  Please E-Mail (and any & all info to both of us since Robin works full time and I can help too!  It would be cool to find something like a bank owned or foreclosure that needed some fixing up cosmetically or perhaps a 3 bedroom we could add a 4th,  a 3 bedroom with unfinished basement that we could add a bedroom, at least something to work with.  and we just want to get things going with a new cash out here!!!

Thanks, you're

Kelley

From: Larry & Marilyn <larryanmari@yahoo.com>
To: Robin Thomas <thom...@yahoo.com>
Sent: Sun, June 5, 2011 6:41:28 PM
Subject: Re: Market Address Listing Info

Glton #1074Hs

This is needing a bed but not closed

There is nothing below the 125 mark + not bump the price and send you some from 130,000 to 149,000. Do you have any idea on amount you can qualify for ya?

Adam yes

Marilyn

**From:** kelleybrown1@comcast.net
**Sent:** Friday, March 09, 2012 7:41 AM
**To:** larryandmariland
**Subject:** HOME SWEET HOME

Marilyn-

Robin and I need to look at houses regardless of Greg / Mortgage because we have all of us today to look at them since it is a half day for kids....

4 houses to look at would be great!

Greg is working on our paperwork 1st thing this morning and we just have a few more things to get him.

_____

Kelley Brown
kelleybrown1@comcast.net
(616) 706-6123

No virus found in this message.
Checked by AVG - www.avg.com
Version: 2012.0.1913 / Virus Database: 2114/4858 - Release Date: 03/08/12

# EXHIBIT B

XFINITY Connect

kelleybrown1@comcast.net
Font Size

Re: New home purchase details

From: kelleybrown1@comcast.net

Subject: Re: New home purchase details

To: gsalisbury@adamortgage.com

Greg, I did send you a lot of those docs already so lets try not to duplicate what was already sent... we sent our licenses in for sure and my tax info...here are my navy w2s...and retirement stuff.

Kelley brown
kelleybrown1@comcast.net
(616) 706-6173

Wed, Mar 07, 2012 10:06 PM
4 attachments

From: "Greg Salisbury" <gsalisbury@adamortgage.com>
To: kelleybrown1@comcast.net, fromille@yahoo.com
Cc: larryandmarilyn@grar.com                    → ROBIN THOMAS (FROMILLE)
Sent: Wednesday, March 7, 2012 6:36:00 PM
Subject: New home purchase details

Kelley & Robin,

Please call me as soon as possible to discuss your mortgage options.

If we try to use the USDA Rural Housing Admin loan with $0 down and NO mortgage insurance we must demonstrate that your home on 36th St. is too small for you two and the 3 kids. Marilyn said it's a tri-level and the way those are dealt with for square footage on the appraisal could be a benefit to your situation. If you can find the most recent appraisal done on that home, please email it to me. I also understand that your last mortgage was done in 2007 and is an adjustable. Please also send me a recent mortgage statement. If it is adjustable, I know the rates have dropped over the last few years. You might want to look at locking the rate on a fixed depending on how long you plan to keep the house. I'll help you write the letter to USDA and the mortgage underwriter but we also need to fill in some holes on your Loan Application. We don't need any originals so either scan and email or fax the following:

- 2 most recent pay stubs for Robin
- 2010 & 2011 W-2s
- 2009 & 2010 federal tax returns for Kelley (all pages) If you have filed 2011, send those and not 2009.
- Navy Reserve pay stubs if you get them
- 2010 & 2011 W-2s for Navy
- home owner's insurance for 36th St home

http://web.mail.comcast.net/zimbra/h/printmessage?id=532266&tz=America/New_York

8/13/2014 10:58 AM

1 of 2

XFINITY Connect

http://web.mail.comcast.net/zimbra/h/printmessage?id=53112&tz=America/New_York&x...

kelleybrown1@comcast.net

*Font Size*

XFINITY Connect

**Fwd: House to See -- Kelley & Robin**

Mon, Mar 05, 2012 08:01 AM

**From :** kelleybrown1@comcast.net     *ME*

**Subject :** Fwd: House to See -- Kelley & Robin

**To :** Greg Salisbury <gsalisbury@adamortgage.com>     ADA MORTGAGE

Greg, Do you do these MCC certificates ???

Thanks-

Kelley Brown
kelleybrown1@comcast.net
(616) 706-6123

**From :** "Larry & Marilyn" <larryandmarilyn@grar.com>     REALTORS
**To:** kelleybrown1@comcast.net     → ME
**Sent:** Sunday, March 4, 2012 7:55:11 PM
**Subject:** Re: House to See -- Kelley & Robin

Yes you can. I will pull these and do some more searching and see what else comes up. What are you guys going to do about the mortgage? Are you going to call Exchange and do the MCC certificate to save some money? Let me know

Marilyn

**From:** kelleybrown1@comcast.net
**Sent:** Sunday, March 01, 2012 7:41 PM
**To:** larryandmarilyn@grar.com
**Subject:** House to See -- Kelley & Robin

Can we see some houses Friday at 2:00 pm ??

We drove by white fawn house... cute woody setting and neighborhood...

8710 White Fawn http://realestate.mlive.com/?classification=real+estate&temp_type=detail&tp=RE_mlive&property=nlive.com&finder=buy&ad_id=585710490

1 of 2

8/13/2014 12:16 PM

http://web.mail.comcast.net/zimbra/h/printmessage?id 533612&tz America/New_York&xim

XFINITY Connect

kelleybrown1@comcast.net
Font Size

HOME SWEET HOME

From : kelleybrown1@comcast.net

Subject : HOME SWEET HOME

**To :** larryandmarilyn <larryandmarilyn@grarcom>   To: *ME*
**Bcc :** Robin Fromille <fromille@yahoo.com>   *REALTORS*
   *ROBIN*

Fri, Mar 09, 2012 07:41 AM

Marilyn   → *ADA MORTGAGE*

Robin and I need to look at houses regardless of Greg / Mortgage because we have all of us today to look at them since it is a half day for kids....

4 houses to look at would be great!

Greg is working on our paperwork 1st thing this morning and we just have a few more things to get him.

Kelley Brown
kelleybrown1@comcast.net
(616) 706 6123

http://web.mail.comcast.net/zimbra/h/printmessage?id=53226&xi... American New York...

- driver's licenses
- recent retirement statement (all pages)
- 2 most recent bank statements (all pages)
- recent mortgage statement for 36th St home
- divorce decree (all pages)

I will be able to determine exactly how much house you can afford and the best available program for you once I have these.

Thanks,
Greg Salisbury
Branch Manager
616–258-5662
Toll Free: 888-826-7117
Fax: 877-567-3536
Email: gsalisbury@adamortgage.com

*CONFIDENTIALITY AND PRIVILEGE NOTICE*

*This electronic mail transmission and any attachment may contain confidential, proprietary and/or legally privileged personal information, as that term is defined in the Gramm-Leach-Bliley Act (collectively, Confidential Information), intended for the named recipient(s) only. Any review, use, disclosure, distribution, copying or other action regarding the information contained in this transmission and any attachment by an unnamed recipient is legally prohibited. If you are not a named recipient, immediately call me at 888-826-7117 or send a reply email and then delete and purge this transmission and any attachment from your computer system. Thank you.*

AMERIPRISE January_2012_Statement.pdf — KELLEY BROWN (RETIREMENT INFO)
260 KB
20111231_2011_mutual_fund_annual_statement_roth_ira_6977.pdf —        "
234 178 KB
navy2010.pdf        W2 — NAVY
119.9 KB
NAVY 2011.pdf        W2 — NAVY
119.9 KB

8/1/2014 10:58 AM

2 of 2

XFINITY Connect

kelleybrown1@comcast.net
· Font Size

KELLEY BROWN DOCS My Tax Form

From : kelleybrown1@comcast.net

Subject : KELLEY BROWN DOCS My Tax Form

Sun, Feb 26, 2012 09:12 PM

1 attachment

To : Greg Salisbury <gsalisbury@adamortgage.com>

I have attached my final tax form.
FYI: It may be lengthy...
Perhaps you could tell me about how much home we can buy so we can keep a good lookout...
We both make a combined 63K.

Thanks-

Kelley Brown
kelleybrown1@comcast.net
(616) 706-6123

Kelley R Brown 2011 Tax Return.pdf
2 MB

http: web.mail  ast.net zimbra h printmessage?id=532266&t=

XFINITY Connect

kelleybrown1@comcast.net
Font Size

Re: New home purchase details

From : kelleybrown1@comcast.net

Subject : Re: New home purchase details

Wed, Mar 07, 2012 10:06 PM

To : gsalisbury@adamortgage.com

4 attachments

Greg, I did send you a lot of these docs already so lets try not to duplicate what was already sent...
we sent our licenses in for sure and my tax info...here are my navy w2s...and retirement stuff...

Kelley Brown
kelleybrown1@comcast.net
(616) 706-6123

**From:** "Greg Salisbury" <gsalisbury@adamortgage.com>
**To:** kelleybrown1@comcast.net, fromille@yahoo.com
**Cc:** larryandmarilyn@grar.com
**Sent:** Wednesday, March 7, 2012 6:36:00 PM
**Subject:** New home purchase details

Kelley & Robin,

Please call me as soon as possible to discuss your mortgage options.
If we try to use the USDA Rural Housing Admin loan with $0 down and NO mortgage insurance we must
demonstrate that your home on 36th St. is too small for you two and the 3 kids.  Marilyn said it's a tri-level
and the way those are dealt with for square footage on the appraisal could be a benefit to your situation.  If
you can find the most recent appraisal done on that home, please email it to me.  I also understand that
your last mortgage was done in 2007 and is an adjustable.  Please also send me a recent mortgage
statement.  If it is adjustable, I know the rates have dropped over the last few years.  You might want to
look at locking the rate on a fixed depending on how long you plan to keep the house.
I'll help you write the letter to USDA and the mortgage underwriter but we also need to fill in some holes
on your Loan Application.
We don't need any originals so either scan and email or fax the following:
- 2 most recent pay stubs for Robin
- 2010 & 2011 W-2s
- 2009 & 2010 federal tax returns for Kelley (all pages) If you have filed 2011, send those and not 2009.
- Navy Reserve pay stubs if you get them
- 2010 & 2011 W-2s for Navy
- home owner's insurance for 36th St home
- driver's licenses
- recent retirement statement (all pages)
- 2 most recent bank statements (all pages)
- recent mortgage statement for 36th St home
- divorce decree (all pages)
I will be able to determine exactly how much house you can afford and the best available program for you
once I have these.
Thanks,
Greg Salisbury
Branch Manager
616-258-5562
Toll Free: 888-926-7117

1 of 2

7 9 2014 5:23 PM